In the Matter of Arthur W. DILSAVER, Hilton Land & Cattle Co., Kenneth and Peggy Hilton, James M. and Rosemarie Pflum, Peter and Rachel Regier, Debtors.

Bankruptcy Nos. BK86-2334, BK86-2405, BK86-2406, BK87-697 and BK86-1890.

United States Bankruptcy Court, D. Nebraska.

May 13, 1988.

William Needler of Wm. L. Needler & Associates, Ltd., Chicago, Ill., Arlan Wine, Wauneta, Neb., for debtor.

Nancy Svoboda, James McClymont, George Vinton of Kelley, Scritsmeier, Moore & Byrne, P.C., North Platte, Neb., for Federal Land Bank of Omaha (FLB).

Jess Nielsen of Nielsen & Birch, North Platte, Neb., for H.B.E. Leasing.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

These cases raise the issue of whether the Agricultural Credit Act of 1987 (Act) is applicable in the bankruptcy setting.

### Statement of Facts
### In the Matter of Dilsaver:

The FLB is a secured creditor of Arthur Dilsaver, debtor, and holds a real estate mortgage which provides for the conveyance of rents and profits if foreclosure is initiated. Debtor apparently was not in default on his obligation to the FLB prior to filing for Chapter 11 relief in August, 1986.

On April 20, 1988, at North Platte, Nebraska, a hearing was held before this Court to consider debtor's third disclosure statement and the FLB's motion to sequester rents and profits from the land encumbered by the FLB mortgage. The Court ordered debtor to prepare and file with the

Court within ninety days a joint plan and disclosure statement. The Court took the motion to sequester rents and profits under advisement.

Because the automatic stay prevents the FLB from initiating a foreclosure action and requesting the appointment of a receiver, the FLB asserts that Section 552 of the Bankruptcy Code permits the FLB to perfect its lien in rents and profits upon application to this Court.

Debtor contends that the rents and profits are property of the estate; thus the application to sequester these rents and profits can be approved only if the Court first orders relief from the stay. Such relief can not be permitted unless the requirements of Section 362(d) are satisfied. Further, debtor argues, the FLB's request is futile because the trustee, under the authority of Sections 544 and 549, may avoid unperfected liens. Moreover, Nebraska law requires the appointment of a receiver before rents and profits can be sequestered, Neb.Rev.Stat. § 25–1081 (Reissue 1985), yet Section 105(b) of 11 U.S.C. prohibits a bankruptcy court from appointing a receiver "in a case under this title."

Debtor has requested restructuring of his loan under the Act and asserts that, notwithstanding his other arguments, the Act prohibits the FLB from sequestering rents and profits. In other words, sequestering property of the estate would interfere with debtor's ability to restructure his distressed loan.

*In the Matter of Hilton Land & Cattle Co.,* and *In the Matter of Hilton:*

The FLB is a secured creditor of Hilton Land & Cattle Co. and Peggy and Kenneth Hilton, debtors, and holds a mortgage on debtors' property. Debtors were in default on this obligation at the time their Chapter 11 petition for relief was filed in August, 1986. The two cases have been procedurally consolidated. At the March 8, 1988, hearing on the FLB's motion to sequester rents and profits, the Court ordered both parties to provide written legal arguments. On April 19, 1988, the hearing on debtors' joint amended disclosure statement was held, and the Court ordered further amendments within thirty days.

Both parties' arguments regarding the motion to sequester are similar to those in *In the Matter of Dilsaver.* Additionally, the FLB claims that debtors agreed that if the FLB would provide the opportunity to restructure, debtors would not impede nor delay the progress of the bankruptcy action. The FLB has provided notice to debtors as required by the Act.

Debtors point to language in their mortgage which states that the mortgage is subject to the Farm Credit Act. Therefore, debtors argue, the FLB cannot claim that the Act does not apply.

*In the Matter of Pflum:*

James and Rosemarie Pflum, debtors, filed for Chapter 11 relief on March 9, 1987. The FLB is a secured creditor of debtors, but debtors were not in default on this obligation at the time their Chapter 11 petition was filed. Debtors' first amended disclosure statement and the FLB's disclosure statement have been taken under advisement by this Court. On January 26, 1988, the FLB filed a motion for sequestration of rents and profits. At the March 8, 1988, hearing on this motion, the Court ordered the parties to submit written arguments. In addition to the arguments *supra,* the FLB contends the Act cannot be applied retroactively to loans that were distressed prior to the passage of the Act nor should debtors receive the protections of both the Act and the Bankruptcy Code.

*In the Matter of Regier:*

The FLB is a secured creditor of Peter and Rachel Regier, debtors, and holds three real estate mortgages on debtors' property. At the time debtors filed for Chapter 11 relief, June 30, 1986, debtors were in default on their obligations to the FLB. On April 4, 1988, debtors requested restructuring of their FLB loans. The FLB moved to sequester rents and profits from the real estate subject to the FLB's mortgages which motion was heard April 20, 1988, at North Platte, Nebraska. Both parties' pleadings contain essentially the same arguments as in the above cases.

The Court took the motion to sequester under advisement without requesting additional legal arguments.

### *Discussion*

The Court has reviewed the legal arguments presented by all the parties and has read both the Agricultural Credit Act of 1987, Pub.L. 100–233, 1987 U.S.Code Cong. & Admin.News (101 Stat.) 1568–1718, and its legislative history, H.R.Rep. No. 295(I), 100th Cong., 1st Sess. 1–389, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2723–2955 and H.R.Con.Rep. No. 490, 100th Cong., 1st Sess. 161–324, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2956–3119.

■ In general, the Court finds no provision in the Act to substantiate the FLB's assertion that the protections afforded by the Act are not available to borrowers who filed bankruptcy petitions prior to the effective date of the Act, January 6, 1988.

The preface to the Agricultural Credit Act of 1987 describes it as: "An Act to provide credit assistance to farmers, to strengthen the Farm Credit System, to facilitate the establishment of secondary markets for agricultural loans, and for other purposes." Pub.L. 100–233, 1987 U.S.Code Cong. & Admin.News (101 Stat.) 1568. A more comprehensive explanation of the Act's purpose is provided in the legislative history:

> H.R. 3030 will require Farm Credit System lenders to restructure the loans of financially-stressed farmers-borrowers, in order to help keep farmers on the land and help turn around the condition of stressed System institutions. Restructuring (which involves compromise of debt obligations) will be required if that is the least-cost alternative, that is, if it will produce more return to the lender than foreclosure.

> Similar requirements will be imposed on the Farmers Home Administration with respect to its farm loans.

. . . . .

The Bill includes a number of provisions designed to give Farm Credit System and Farmers Home Administration farm borrowers under financial stress a fair opportunity to overcome their credit problems without adversely affecting creditors' rights.

These include: review of adverse credit decisions, homestead authorities, rights of "first refusal" so family farmers can repurchase foreclosed property, borrower access to information, and an improved Farmers Home Administration interest rate buy-down program.

. . . . .

Much of the impetus for H.R. 3030 derives from the continuing depression in agriculture that began in the early 1980's but whose roots originate in the inflationary period in the late 1960's and 1970's. During that period, the United States agricultural giant reacted to higher commodity prices, persistent hunger in some parts of the world, and technoogical [sic] gains by vastly increasing production. This was accomplished by increasing both yields per acre and bringing 70 to 80 million new acres into crop production between the 1970's and the 1980's. These production increases required vast capital expenditures that resulted in aggregate farm debt growing from about $80 billion in 1960 to almost $220 billion by the early 1980's. That aggregate debt has now dropped to approximately $175 billion and much of the loss has been borne by farmers and their lenders.

H.R. 3030, however, is not a bill designed simply to mitigate today's problems. It looks to the future—to an agricultural delivery system that not only will have dealt sensitively with today's financially-stressed farm borrowers but one that will be more competitive, more efficient, and more responsive to economic realities. It will have new safeguards that should help the Nation's agriculture industry to avoid future situations similar to current circumstances.

. . . . .

Dozens of witnesses representing farmer and commodity groups testified before the Committee as to two basic weaknesses in the way many System in-

stitutions have dealt with its problems. First, System lenders have been exceedingly reluctant to restructure individual loans on a case-by-case basis; and, second, the tensions and pressures on both borrowers and lenders, brought on by financial distress, have caused collapse of the traditional sense of comity and good will between the System and its borrowers/owners.

H.R. 3030 addresses both these problems forthrightly by simply requiring that System lenders restructure nonaccrual loans if such restructuring is less expensive for the institution than foreclosure. The bill also gives legal standing to a series of enhanced rights of borrowers in dealings between themn(sic) and System lenders.

. . . . .

Loan restructuring as envisioned in H.R. 3030 could include rescheduling, reamortization, renewal, deferral of principal, or interest monetary concessions, or other action regarding an outstanding loan, that would make it probable that the borrower's operation would become financially viable. *The purpose of this required restructuring purely and simply is to keep the farmer in business so long as that can be accomplished as cheaply as foreclosing the loan.* If properly done on appropriate cases, the circumstances can be very positive. The borrower remains on the farm in a viable operation where he can continue in his chosen profession and avoid the agony of losing the way of life enjoyed by the farm family. The institution, while it may take a financial loss, will not lose any more than if it had foreclosed the loan under which circumstances it would likely acquire property that would be a financial drain, disrupt the lives of the borrower and his family, and add to the tensions in the rural community.

H.R.Rep. No. 295(I), 100th Cong. 1st Sess., 52–54, 62–63, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2723–25, 2733–34 (emphasis added).

The House Report described a restructuring effort being carried out by the St. Paul Farm Credit Bank which program is similar to the program authorized in the Act. Larry Buegler, President of the St. Paul Farm Credit Banks, testified that "[t]he restructuring effort has permitted us to reach a settlement agreement with 45 percent of the borrowers who were in litigation, i.e. bankruptcy or foreclosure." *Id.* at 2734. He went on to say:

It is important to note that *not all* of the restructured loans will perform according to their restructured agreements and we realize that some of our problems have been deferred out to future years. But we feel strongly that some income is better than no income on these loans. In all instances we have inserted language in our agreements that enable us to restore the full amount of debt prior to restructuring if there is a default.

*Id.* (emphasis in original).

The Court recites portions of the legislative history verbatim to demonstrate the broad intent of the Act and its remedial character. It appears to cover all circumstances of a borrower in distress. In addition to this legislative history, incorporated into the body of the Act is a policy statement entitled "Sense of Congress" which is equally comprehensive:

It is the sense of Congress that the banks and associations (except banks for cooperatives) operating under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.) should administer distressed loans to farmers with the objective of using the loan guarantee programs of the Farmers Home Administration and other loan restructuring measures, including participation in interest rate buy-down programs that are Federally or State funded, and other Federal and State sponsored financial assistance programs that offer relief to financially distressed farmers, as alternatives to foreclosure, considering the availability and appropriateness of such programs on a case-by-case basis.

P.L. 100–233, 1987 U.S.Code Cong. & Admin.News (101 Stat.) 1578, 1579.

The only provision in the Act which addresses applicability of the Act is Section

102 entitled "Restructuring Distressed Loans":

(k) Application of Section—The time limitation prescribed in subsection (b)(2), and the requirements of subsection (c), shall not apply to a loan that became a distressed loan before the date of the enactment of this section if the borrower and lender of the loan are in the process of negotiating loan restructuring with respect to the loan.

*Id.* at 1577.

The time limit reference in the above passage refers to a forty-five day notice requirement that a lender must provide to a borrower before the lender initiates foreclosure. *Id.* at 1575. This notice informs the borrower that the loan may be suitable for restructuring. Subsection (c) requires the lender to meet with the borrower to review the borrower's loan status and its potential for restructuring. *Id.* Subsection (k) does not exclude from the Act's protection either debtors in bankruptcy or borrowers whose loans became distressed prior to the passage of the Act. Rather, it sets forth when the time limitation for notice and meetings applies to distressed loans in existence before the date of the Act. In other words, if the borrower and lender were not in the process of negotiating loan restructuring prior to the passage of the Act, these time limitations and meeting requirements do apply.

The legislative history supports this interpretation:

The Conference substitute adopts the House provision with amendments deleting the words "or the taking of preventative action", and clarifying that this provision only applies to the requirements regarding the timeframe for notice of restructuring availability and the requirements for a personal meeting between the lender and the borrower.

H.R.Con.Rep. No. 490, 100th Cong., 1st Sess. 161, 170, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2956, 2965.

"Bankruptcy" does appear in the House Conference Report's discussion of the definitions used in the Act. The Report includes the phrase "bankruptcy proceeding" in its definition of a distressed loan: "[A distressed loan] means a loan that the borrower does not have the financial capacity to pay according to its terms, *but that is not yet subject to a foreclosure or bankruptcy proceeding.*" *Id.* at 2959 (emphasis added). However, the definition incorporated in the Act reads:

The term "distressed loan" means a loan that the borrower does not have the financial capacity to pay according to its terms and that exhibits one or more of the following characteristics:

(A) The borrower is demonstrating adverse financial and repayment trends.

(B) The loan is delinquent or past due under the terms of the loan contract.

(C) One or both of the factors listed in subparagraphs (A) and (B), together with inadequate collateralization, present a high probability of loss to the lender.

Pub.L. 100–233, 1987 U.S.Code Cong. & Admin.News, (101 Stat.) 1568, 1574. The words "or bankruptcy proceeding" which appear in the legislative history have been deleted from the Act. This deletion together with the legislative history, *supra* pp. 1012–1014, convinces the Court that Congress did not intend a per se exclusion of debtors in bankruptcy from the protection of the Act. The deletion appears an intentional choice by Congress to avail debtors of the loan restructuring contained in the Act. "What Congress rejected should not be injected." *In re Davis*, 20 B.R. 519, 521 (Bankr.M.D.Ga.1982).

Certainly Congress could include specific exclusionary language if it so desired. For example, when Congress passed the Family Farmer Bankruptcy Act of 1986 the applicability of that Act was spelled out: "The amendments made by subtitle B of title II [of this Act] shall not apply with respect to cases commenced under title 11 of the United States Code ... before the effective date of this Act ... ." 28 U.S.C.A. § 581 note (c)(1) (1988).

Because the Court has found that the Act has, *inter alia,* a remedial purpose,

supra p. 1013, and because application of the Act to debtors in bankruptcy does not create an extraordinary burden on the Farm Credit System, the Court will not except from the Act borrowers who filed bankruptcy petitions prior to its effective date. Therefore, based on the facts in the instant cases and the definition of "distressed loan" contained in the Agricultural Credit Act, the Court finds that debtors' FLB loans are distressed loans. Accordingly, they may be eligible for protection provided by the Act.

The Act prohibits certain lenders from initiating foreclosure or continuing any foreclosure proceeding with respect to any distressed loan until the lender has evaluated the loan for restructuring. Pub.L. 100–233, 1987 U.S.Code Cong. & Admin.News (101 Stat.) 1568, 1575. The Act defines foreclosure proceeding as:

> (A) a foreclosure or similar legal proceeding to enforce a lien on property, whether real or personal, that secures a nonaccrual or distressed loan; or

> (B) the seizing of and realizing on nonreal property collateral, other than collateral subject to a statutory lien arising under title I or II, to effect collection of a nonaccrual or distressed loan.

*Id.* at 1574.

The motions to sequester rents and profits before the Court fit within the confines of the definition "foreclosure proceeding." The FLB wishes to realize on nonreal property collateral as adequate protection for its distressed real estate loans, and its motion to sequester rents and profits is the first step towards the enforcement of a claim against property of the estate.

But for bankruptcy, Nebraska law would require the FLB to first initiate a foreclosure proceeding before requesting appointment of a receiver and sequestration of rents and profits. Neb.Rev.Stat. § 25–1081, 1082 (Reissue 1985). *See In re Anderson,* 50 B.R. 728 (D.Neb.1985) (outlining the required procedure for sequestration within bankruptcy). *See also Saline State Bank v. Mahloch,* 834 F.2d 690 (8th Cir.1987) (holding that Section 552 permits the Court to allow post-petition sequestration of rents and profits).

In *In re Anderson,* the District Court explained its reason for permitting segregation of rents and profits within the bankruptcy context: "The Bankruptcy Court would be exercising its equitable powers to protect substantive rights which do exist under state law." *In re Anderson,* 50 B.R. at 733. However, in the instant cases, outside bankruptcy the FLB would be required to comply with the Act before it could commence foreclosure—a prerequisite to seeking sequestration of rents and profits. Even if the Act were not applicable to debtors in bankruptcy, the Court will not grant rights to the FLB within the bankruptcy setting that are unavailable to it outside of bankruptcy. 11 U.S.C. § 552 (1987).

### Holding

The Court holds that the mere fact that the borrowers are debtors in bankruptcy does not excuse the FLB from compliance with the Act. On the facts of the present cases, the FLB's compliance is a condition precedent to the commencement of a proceeding within bankruptcy that constitutes a foreclosure proceeding as defined by the Act. Therefore, the Court rules as follows:

### In the Matter of Dilsaver:

The FLB's motion to sequester rents and profits from the real estate secured by the FLB mortgage is overruled. The Court finds that such motion is a foreclosure proceeding and subject to the provisions of the Act. The FLB is directed to provide the appropriate restructuring process as requested by debtor.

### In the Matter of Hilton Land & Cattle and In the Matter of Hilton:

The FLB's motion to sequester rents and profits is overruled. The Court finds that such motion is a foreclosure proceeding and subject to the provisions of the Act. The FLB is directed to provide the appropriate restructuring process as requested by debtors.

*In the Matter of Pflum:*

The FLB's motion to sequester rents and profits is overruled. The Court finds that such motion is a foreclosure proceeding and subject to the provisions of the Act.

*In the Matter of Regier:*

The FLB's motion to sequester rents and profits is overruled. The Court finds that such motion is a foreclosure proceeding and subject to the provisions of the Act. The FLB is directed to provide the appropriate restructuring process as requested by debtors.

A separate journal entry will be entered this date in each case.