John GRIFFIN and Sondra Griffin, Plaintiffs,

v.

FEDERAL LAND BANK OF WICHITA, Defendant.

No. 88–1599–C.

United States District Court, D. Kansas.

Feb. 16, 1989.

Ann M. Zimmerman, Marilyn Harp, Legal Services of Wichita, Wichita, Kan., for plaintiffs.

Martin R. Ufford, Redmond, Redmond, O'Brien & Nazar, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on both parties' motions for summary judgment. Plaintiffs filed their complaint on October 14, 1988, seeking to enforce their rights under the Agricultural Credit Act of 1987 [Act], Pub.Law 100–233, 12 U.S.C. § 2199 *et seq.* At the same time, plaintiffs filed a motion for a temporary restraining order. The court denied plaintiff's motion from the bench stating, *inter alia,* that plaintiffs had not shown irreparable harm nor established a likelihood of success on the merits. The parties then agreed no issues of material fact existed in the case and accepted the court's recommendation to submit the legal issues to it on stipulated facts. Having received the necessary filings, the court is prepared to rule.

The parties have stipulated to the following facts:

1. On or about August 13, 1981, John W. Griffin and Janice K. Griffin, now Janice K. Piatt, made, executed and delivered to The Federal Land Bank of Wichita their promissory note in the original amount of $165,000. In order to secure the indebted-

ness represented by the promissory note, John W. Griffin and Janice K. Griffin executed and delivered to The Federal Land Bank of Wichita their mortgage dated August 13, 1981 encumbering the following described real estate in Reno County, Kansas, together with other property described in said mortgage:

Southwest Quarter (SW ¼) of Section 8, Township 23 South, Range 7 West of the Sixth P.M.

Said mortgage was filed of record in the Office of the Register of Deeds of Reno County, Kansas, on the 19th day of August, 1981 in Mortgage Book 502 at Page 77 in the original amount of $165,000.

2. On February 28, 1986, John Griffin filed for relief under Chapter 7 of the Bankruptcy Code. His debts, including his debt to the Federal Land Bank, were discharged on June 26, 1986.

3. In February, 1987, the Federal Land Bank filed a petition to foreclose the above described note and mortgage in the District Court of Reno County, Kansas.

4. On December 2, 1987, a Journal Entry of Judgment in said foreclosure action was filed with the Clerk of the Reno County District Court.

5. On December 16, 1987, the Federal Land Bank first published a notice of the sheriff's sale on the above described property.

6. On January 6, 1988, the Agricultural Credit Act of 1987 became effective.

7. The sheriff's sale of the Griffins' property was held on January 11, 1988, and Federal Land Bank was the successful bidder at that sale.

8. On July 11, 1988, the redemption period on the subject property expired and the Griffins vacated the premises.

9. On August 29, 1988, The Farm Credit Bank of Wichita entered into a lease of the residence located on the subject property with Jerry and Terri Bribiesca. The Bribiescas subsequently assigned their interests in this lease to Mrs. Katheryn Kuhns.

10. On August 26, 1988, the Farm Credit Bank entered into a custom farming agreement with Tim R. Ayers to custom farm the 313 acres of cropland located on the subject property. Mr. Myers did not lease the subject property from the Farm Credit Bank.

11. On October 18, 1988, the Farm Credit Bank notified Katheryn Kuhns that it would terminate the lease agreement dated August 29, 1988. The Farm Credit Bank has determined it will not release the subject property to any person between now and the time the subject property is sold to a third party.

12. Mr. John Griffin, plaintiff in this case, has been farming land near Nickerson in Reno County, Kansas, since about 1957. His parents farmed land in this area as far back as 1888. Mr. Griffin bought land from his parents in about 1974 for $300 an acre. By the Mid–1980's Mr. Griffin owned 500 acres, including the homestead which had belonged to his parents. He rented and farmed an additional 880 acres in the same area. His farming operation consisted of raising wheat, milo, and millet, and feeding cattle.

Upon these stipulations, no genuine issues of material fact remain to prevent the court's entry of judgment as a matter of law.

The parties have identified three issues for the court's decision. First, whether plaintiffs have any restructuring rights under the Act when the judgment of foreclosure was entered prior to the effective date of the Act, January 6, 1988, but the foreclosure sale occurred after that date? Second, what relief, if any, are plaintiffs entitled to because defendant leased the plaintiff's former farm residence without giving them the first right of refusal to lease? Finally, is defendant's custom farming agreement with a third party on plaintiff's former farm ground subject to plaintiffs' first right of refusal to lease? The issues will be addressed seriatim.

I. *Restructuring Rights Under the Act*

Congress passed the Act in an effort "to provide credit assistance to farmers, to strengthen the Farm Credit System, to facilitate the establishment of secondary mar-

kets for agricultural loans, and for other purposes." Preface to Pub.L. 100–233, 1987 U.S.Code Cong. & Admin.News, 101 Stat. 1568. As to the rights of farmers-borrowers, a more detailed explanation of Congress' general intent is found in the House report:

H.R. 3030 will require Farm Credit System lenders to restructure the loans of financially-stressed farmers-borrowers, in order to help keep farmers on the land and help turn around the condition of stressed system institutions. Restructuring (which involves compromise of debt obligations) will be required if that is the least cost alternative, that is, if it will produce more return to the lender than foreclosure.

. . . .

Loan restructuring as envisioned in H.R. 3030 could include rescheduling, reamortization, renewal, deferral of principal, or interest monetary concessions, or other action regarding an outstanding loan, that would make it probable that the borrower's operation would become financially viable. The purpose of this required restructuring purely and simply is to keep the farmer in business so long as that can be accomplished as cheaply as foreclosing the loan. If properly done on appropriate cases, the circumstances can be very positive. The borrower remains on the farm in a viable operation where he can continue in his chosen profession and avoid the agony of losing the way of life enjoyed by the farm family. The institution, while it may take a financial loss, will not lose any more than if it had foreclosed the loan under which circumstances it would likely acquire property that would be a financial drain, disrupt the lives of the borrower and his family, and add to the tensions of the rural community.

H.R.Rep. No. 100–295(I), 100th Cong. 1st Sess., 52, 62–63, *reprinted in* 1987 U.S. Code Cong. & Admin.News 2723, 2733–34.

The loan restructuring process is primarily set forth at 12 U.S.C. § 2202a. Once a loan is or has become distressed, the lender is required to give written notice to the borrower that the loan may be suitable for restructuring and to provide a copy of lender's policy governing treatment of distressed loans and all materials necessary for borrower to submit an application for restructuring. 12 U.S.C. § 2202a(b)(1). Written notice must be provided no later than 45 days before the lender commences foreclosure proceedings. 12 U.S.C. § 2202a(b)(2). A lender may not foreclose or continue any foreclosure proceeding before completing its pending consideration of the loan for restructuring. 12 U.S.C. § 2202a(b)(3).

As another right of the borrower before foreclosure, the Act requires the lender to provide the borrower a reasonable opportunity to meet personally with the lender's representative to review the loan and its suitability for restructuring and to aid the development of a restructuring plan. 12 U.S.C. § 2202a(c).

Upon receipt of the borrower's application for restructuring, the lender must decide whether to restructure the loan after considering a number of listed factors. 12 U.S.C. § 2202a(d)(1). "This section [2202a] shall not prevent a qualified lender from proposing a restructuring plan for an individual borrower in the absence of an application for restructuring from the borrower." 12 U.S.C. § 2202a(d)(2). If it determines the cost of restructuring under the proposed plan is less than or equal to the potential cost of foreclosure, the lender must restructure as proposed. 12 U.S.C. § 2202a(c)(1). The Act spells out the factors relevant to the lender's comparison of costs. 12 U.S.C. § 2202a(e)(2).

Each farm credit district board of directors must develop a restructuring policy which explains the procedure for submitting an application for restructuring and the borrower's right to seek review of a denial of the application before a credit review committee. 12 U.S.C. § 2202a(g). The policy must have been developed within 60 days after January 6, 1988. 12 U.S.C. § 2202a(g)(1). A copy of this policy accompanies the notice of distressed loan sent to the borrower. 12 U.S.C. § 2202a(b)(1) and (2).

The applicability of § 2202a is addressed in subsection (k), which provides:

The time limitation prescribed in subsection (b)(2), and the requirements of subsection (c), shall not apply to a loan that became a distressed loan before the date of the enactment of this section if the borrower and lender of the loan are in the process of negotiating loan restructuring with respect to the loan.

As previously described, subsection (b)(2) requires a 45–day notice before commencement of foreclosure proceedings, and subsection (c) requires the lender to provide the borrower with a reasonable opportunity to meet and discuss restructuring. Subsection (k) essentially allows the application of § 2202a to loans that became distressed before the date of enactment, January 6, 1988, unless the borrower and lender are already negotiating over loan restructuring. *Matter of Dilsaver,* 86 B.R. 1010, 1014 (Bkrtcy.D.Neb.1988).

██ Even though the judgment of foreclosure has been entered and the foreclosure sale has been held, plaintiffs believe they still have restructuring rights under the Act because the foreclosure sale occurred after January 6, 1988. For support, plaintiffs rely on the language of 12 U.S.C. § 2202a(b)(3) and the interpretation of that provision in *Harper v. Federal Land Bank of Spokane,* 692 F.Supp. 1244, 1249 (D.Or.1988). Specifically, § 2202a(b)(3) states:

(3) Limitation on Foreclosure.—No qualified lender may foreclose or continue any foreclosure proceeding with respect to any distressed loan before the lender has completed any pending consideration of the loan for restructuring under this section.

In *Harper,* the defendant Federal Land Bank (FLB) obtained a default judgment of foreclosure against the plaintiffs in September of 1987. The sheriff's sale was held in March of 1988, and the FLB purchased it. Looking to the terms of § 2202a(b)(3), the federal court held:

By stating that no lender shall continue a foreclosure proceeding without first considering restructuring, Congress intend-

ed a complete moratorium on all foreclosure proceedings. Under state law, the Harpers retained the right to terminate the foreclosure decree prior to the sheriff's sale ORS 88.100. Defendants by pursuing the sheriff's sale continued the foreclosure in violation of their obligations under the Act.

692 F.Supp. at 1249. The court reached this conclusion without any lengthy discussion and any reference to any relevant legislative history. This court disagrees with the holding in *Harper.*

The court incorporates its prior ruling in the temporary restraining order hearing that because of the merger doctrine in Kansas, once the judgment of foreclosure was entered there was no longer a distressed loan under the terms of § 2202a(b)(3). See *In re McKinney,* 84 B.R. 751 (D.Kan.1988); *Price v. Bank,* 62 Kan. 735, 739, 64 Pac. 637 (1901) (Both decisions hold that a note and mortgage lien merge into a foreclosure judgment). Using this same reasoning, the District Court of Clay County, Kansas, has similarly ruled that the borrower had no restructuring rights under the Act so as to require a stay of the Sheriff's sale. *Federal Land Bank v. Law,* No. 84–C–15 (June 17, 1988).

██ The court believes a better rationale for its holding is found in subsection (k), which is the only provision addressing the applicability of § 2202a. As a time limitation, subsection (k) excepts the untimely situations from the requirements of the two initial steps of the loan restructuring process—notice and meetings. These first two steps trigger and preserve a borrower's loan restructuring rights. What then are the circumstances or situations which are untimely or fall outside the scope of § 2202a? First, it is significant that subsection (k) only addresses *loans.* As used throughout the Act, loan is used to represent the contractual credit arrangement between the borrower and lender. See 12 U.S.C. § 2202a(a)(3) and (5). Congress does not use "loan" to represent a general indebtedness embodied in a judgment. Consequently, subsection (k) presumes § 2202a will be applied only to existing

loans, and then the notice and meeting requirements do not apply to those loans that became distressed before January 6, 1988, and upon which the borrower and lender are in process of negotiating loan restructuring. Once again the court resorts to the Kansas merger doctrine and concludes that no loan existed as of January 6, 1988, for the plaintiff to assert his right to notice and subsequent restructuring.

■ The reasonableness of the above statutory construction is sustained through other subsections of § 2202a. Implicit in the *Harper* decision is the notion that a lender *must* determine whether to restructure or not, regardless of the fact that the borrower has not submitted an application for restructuring. Subsection (d)(1) requires a lender's determination of restructuring upon an application, but subsection (d)(2) simply permits or allows a lender to propose restructuring in the absence of an application. In other words, when there is no application the lender is not restricted from considering restructuring *and* nor is it required to make a restructuring determination. Legislative history support this interpretation as seen in the Conference Committee's adoption of the Senate amendment rather than the House bill:

> (d) Under the *House* bill, as soon as practicable after a qualified lender has offered to meet with the borrower on any distressed loan, the lender must review the loan to determine—
>
> ....
>
> The *Senate* amendment also states that nothing in this provision is to prevent a bank or association from proposing a restructuring plan for a borrower in the absence of an application for restructuring from the borrower. (Secs. 4.14A(b)(1) and 4.14A(a)(4).
>
> The *Conference* substitute adopts the *Senate* provision with an amendment adding the requirement that "distressed loans" be reviewed to determine if, consistent with sound lending practices, they can be kept from becoming nonaccrual.
>
> ....

The *Senate* amendment provides that when a Federal land bank or production credit association receives an application for restructuring from a borrower, the institution must determine whether the loan is to be restructured, taking into consideration—

H.R.Conf.Rep. No. 100–490, 100th Cong., 1st Sess., 166, reprinted in 1987 U.S.Code Cong. & Admin.News 2961.

Without a statutory requirement to determine loan restructuring in the absence of an application, plaintiff's position in reliance upon subsection (b)(3) is flawed for yet another reason. A lender is prevented from continuing a foreclosure proceeding only if the lender has not "completed any *pending* consideration of the loan restructuring...." 12 U.S.C. § 2202a(b)(3) (emphasis added). In the case at bar, there is no unfinished, pending consideration, because plaintiffs have not submitted any application for restructuring and defendant has not proposed a restructuring plan in the absence of an application. The present case does not fit the terms of subsection (b)(3).

■ Congress did not intend subsection (b)(3) to operate as "a complete moratorium on all foreclosure proceedings," as stated in *Harper*. Statutory phrases are not construed in isolation, but in context of the statute as a whole. *Barnson v. United States*, 816 F.2d 549, 554 (10th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). For construing an ambiguous statute, the most reliable source of legislative history is the conference report. *Squillacote v. United States*, 739 F.2d 1208, 1218 (7th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 302 (1985). The title and designated subject matter of subsection (b) of § 2202a is "Notice." In paragraph one to subsection (b), the triggering event for and nature of the written notice is described. In paragraph two to subsection (b), the outside time limit for notice is set as no later than 45 days before commencement of foreclosure proceedings. In paragraph three to subsection (b), Congress drifts slightly from the subject matter of notice and provides that a

lender cannot simply terminate its pending consideration of loan restructuring and commence or continue a foreclosure proceeding on a distressed loan. The interrelationship between paragraphs (b)(2) and (b)(3) is revealed in the conference report:

(b) Under the *House* bill, at least 75 days prior to foreclosure on a loan, the lender must notify the borrower as described in item (a) above. The *House* bill also specifically will prohibit a qualified lender from foreclosing on a distressed loan before the lender has completed consideration of the loan for restructuring or preventive action. (Secs. 4.14A(b)(2) and 4.14A(g).)

The *Senate* amendment requires FCS institutions, at least 14 days before accelerating a distressed loan of a borrower who is a family farmer (or otherwise commencing foreclosure on the loan), to notify the borrower in writing of the borrower's right to submit an application for restructuring. (Sec. 402(b).)

The *Conference* substitute adopts the *House* provision with an amendment changing the notification time-frame from 75 to 45 days prior to foreclosure. The *Conference* substitute also adopts an amendment to clarify that no adverse action may be taken while restructuring is still a pending consideration, and an amendment deleting the reference to "preventive action".

H.R.Conf.Rep. No. 100–490, 100th Cong., 1st Sess., 165, reprinted in 1987 U.S.Code Cong. & Admin.News 2960–61. Essentially, paragraphs (b)(2) and (b)(3) circumscribe the lender's ability to foreclose in relation to the borrower's right to restructure, but there is nothing in legislative history nor in the wording of the statutory provisions that indicates Congress intended a moratorium on foreclosure proceedings. Paragraph (b)(3) simply preserves a genuine opportunity for the borrower to submit an application for restructuring and to have it reasonably and timely considered by the lender. The court finds that paragraph (b)(3) does not establish the applicability of § 2202a.

For all of the above stated reasons, the court determines that plaintiffs have no restructuring rights which were denied them when defendants conducted the foreclosure sale after January 6, 1988.

II. *Lease of Farm Residence*

■ The defendant leased the farm residence on August 29, 1988, and notified the assignee of the leasehold interest on October 18, 1988, that it would terminate the lease agreement. By affidavit, defendant has since expressed its intent not to lease the subject property to any person before selling the property to a third person. Plaintiffs argue the defendant's lease of the farm residence was in violation of their right of first refusal provided in 12 U.S.C. § 2219a(c)(1) which states:

Within 15 days after an institution of the System first elects to lease acquired real estate, or any portion of such real estate, the institution shall notify the previous owner by certified mail of the owner's right—

(A) to lease the property at a rate equivalent to the appraised rental value of the property, as established by an accredited appraised rental value of the property, as established by an accredited appraiser; or

(B) to offer to lease the property at a rate that is less than the appraised rental value of the property.

Plaintiffs argue the defendant's expressed intent as to leasing is "arbitrary," "irrational," and contrary to a purpose of the Act to strengthen the Farm Credit System. Plaintiffs assert they have suffered money damages in higher rent and lost profits, but that money damages are inadequate and inappropriate. Plaintiffs call upon the court's equitable powers to order defendant to lease plaintiff's former homestead to them.

Plaintiffs have not referred to any provision within the Act requiring the lender to lease the premises instead of simply holding it prior to its sale. Congress apparently relied on the lenders to develop their own policy on these matters:

The Managers intend that FCS institutions develop and implement a "right of first refusal" policy that encompasses not only agricultural real estate generally, but portions thereof as well. As soon as practicable before or after acquisition, the Farm Credit System should decide whether to offer property for sale or lease, or to hold such property for some interim period. If an FCS institution decides to hold the property in its inventory for an interim period, the institution should offer to lease the residence and outbuildings necessary for family maintenance, to the previous owner for the interim period at fair market rent. If, upon a decision to lease or sell the property, the lender decides to separate the residence from the other property, the institution should offer to lease or sell the residence and outbuildings necessary for family maintenance, to the previous owner for fair market value. The Managers clearly intend that "right of first refusal" programs implemented by FCS institutions embody the spirit generally expressed in the term "homestead protection".

H.R.Conf.Rep. No. 100–490, 100th Cong. 1st Sess. 178, reprinted in 1987 Code Cong. & Admin.News 2973. The equities in the present case do not compel this court to divest the lender of this policy-oriented business decision.

The Act is also silent as to any possible legal redress, if any, upon a lender's violation of the right of first refusal to lease. Defendants are not currently in a lease arrangement in defiance of plaintiff's first refusal rights. Defendant's belief that the farm residence was not agricultural real estate subject to the right of first refusal is reasonable, but obviously contrary to the legislative intent expressed above. The court finds that plaintiffs have not sustained their burden of showing entitlement to equitable relief.

### III. *Custom Farming Agreement*

█ Plaintiffs acknowledge the factual and legal differences between leases and custom farming and how the latter is not contemplated by the Act. Plaintiffs do not persuasively explain their conclusion that custom farming violates their first refusal rights to lease. The court perceives no reason to lengthen this order with a discussion of the obvious differences between a lease and custom farming. Plaintiffs have not contended the particular custom farming agreement at issue is more in the nature of a lease. Congress only refers to leases, and this court will not sit as a legislative body and treat custom farming agreements as leases.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.